Case number 11-1674, Clarker, Inc. v. Ryan A. Hamer, LL. Would the lawyers who are going to argue please approach the bench and introduce yourself to the court, please. David Hughes, on behalf of the appellant. Burlow, Assistant Attorney General, on behalf of the clerk and his director. I'm sorry, I didn't get your last name. Burlow, B-E-R-L-L-A-N-Y. Let's proceed. Good morning. May it please the court. And I would like to reserve five minutes for rebuttal, please. The issue presented to the court this morning concerns whether filtration companies, a packaging company and their common parent company by the name of Clarkor, should be treated as a single unitary business group for Illinois income tax reporting purposes. It's our position that the packaging company is a separate group that should not be included with their filtration affiliates and with the common parent. I think the fatal flaw that the administrative law judge and the circuit court judge committed below is that in analyzing the issue, they fail to look at or analyze the relationship or in our position the lack of relationship between the filtration companies and the packaging companies. You're talking about horizontal integration and vertical control. It does go to horizontal integration in the sense that the packaging companies and the filtration companies provide different products, they sell different products. And for that reason, there really isn't true horizontal integration. As far as the vertical integration goes, I will address that when we get to the lack of the relationship between the parent company and the operating companies. But I think the problem that the ALJ made was that he did not look at the lack of a relationship between the filtration companies and the packaging companies. And the reason it's a fatal flaw or a mistake is because the Income Tax Act itself says that in order to have a unitary business, the persons that would otherwise comprise that unitary business have to contribute to and depend on each other. So in other words, it's not enough that they contribute to and depend on a common parent. There has to be actual contribution and dependency between the operating businesses. That's the rim portion of that? That's exactly right. And that has to run between the subsidiaries? That's correct. So the case you're alluding to is the Envirodyne case from the Seventh Circuit, which is very similar factually to the case that we have here. Does that case support you or support your adversary? It supports us. How? It supports us because, first of all, factually the cases are very similar. What you have in both cases are two separate operating groups. In Envirodyne you had a steel business and a packaging business. Here you have filtration businesses and a packaging business. Some operate in Illinois. Some operate outside Illinois. What Judge Posner said in the Envirodyne case is that in order to consolidate all of those companies for income tax reporting purposes, there has to be integration. There has to be a relationship between the operating companies themselves. The fact that there's a common parent who might provide some centralized functions or services, that by itself is not enough to create a unitary relationship. And that's exactly what we have here is we have two sets of operating companies for which there is no overlap. There's no dependency. There's no contribution. And so going back to the bicycle analogy, what Judge Posner suggested was that even if you have a hub, even if you have a common parent, that's not enough by itself to create a unitary relationship amongst all the companies because you don't have the rim. The rim itself is missing, and without that rim you don't have a unitary business. Well, isn't the parent here just about controlling everything? No, we would disagree. We would disagree. Tell me how. Sure. Well, what the ALJ pointed to was what he considered to be some evidence of centralized management. So, for example, he pointed to common officers and directors. Well, if you look at the record, it's pretty clear that the officers and directors here were figureheads, that they really were not involved in the day-to-day management or the day-to-day running of these businesses. They were there to sign tax returns. They were there to sign annual reports, business license renewals. They were not there to manage the business on a day-to-day basis. The ALJ was.  Wasn't it limited? It was limited, but it was a very broad limit in that the cap on their expenditure authority was $25,000 for capital expenditures. So, in other words, the subsidiaries could spend anything they wanted on non-capital expenditures, rent, utilities, raw materials, consulting. They had unfettered spending authority on those items. Even on the capital items, $25,000 is a relative limit. Do you think that that's control when you're limited to $25,000? I do. I do, because if you look at some of the Illinois unitary cases, I think it was the A.B. Dick case, had a $500 spending limit. So, $25,000 is a relatively high limit. The other thing as well is in terms of spending, what they actually spent the money on, it was up to the subsidiaries to decide because they were the experts. They knew their business. They knew the packaging. They knew the filtration. The executives at Clark were that was not their business. Well, how about the subsidiaries and their decision-making process? Did they have any decision-making process, or was it always the parent company who made those decisions? It was all of the decisions were made at the business units. The record is clear that each business unit had its own president. Did the ALJ make findings of fact or the contrary? I believe what the ALJ suggested is that there was some general oversight. For example, he suggested that the parent company's human resources department had some general oversight over human resource functions. But I think it's important in that regard to remember what U.S. Supreme Court said in Woolworth, which is that the type of occasional oversight that any parent gives to an investment in a subsidiary is not enough to create a unitary relationship. And so if you look at that statement and apply it to the context of this case, keep in mind that Clark Corp. is a publicly traded company. And because it's a publicly traded company, it has a fiduciary duty to its shareholders. It has to protect the investment of its shareholders. So it cannot take a complete hands-off approach to the investment in its subsidiaries. It has to do something to make sure that its shareholders' investments are going to be protected. So whether that's looking at a budget, whether that's providing some type of general oversight for human resources, whether that's moving money around, whatever it might be, it's the type of occasional oversight that any parent, especially a publicly traded parent, is going to give to its subsidiary. Let me ask you the issue I'm grappling with. And it concerns basically the separate paths the Department of Revenue is suggesting are proper to end up at the unified business group determination. One is the strong centralized management path, that if you make a sufficient showing under that prong, you can satisfy the unified business group finding. But I have a hard time understanding that because I don't know where that really comes from other than the regulation. But I thought that was more of a byproduct of unitary business group. It isn't in it of itself sufficient. And I thought that's what Posner was saying, and I thought that's what the statute itself says. The statute itself says there has to be an interdependency between the subsidiaries. It isn't enough just to have this strong centralized management because it's too difficult to, I mean, it's either too easy to meet or it's too difficult to really say what is enough. I think that's exactly right. I think that's exactly right. And if you look at the statute, what you'll see is that there is a definition of a unitary business. And what that says is that a unitary business. But the department did pass that regulation. And that regulation seems to support their position taken in this case. Well, it depends on how you apply that regulation to this case. And what I would suggest is while there is a school of thought to suggest that if you have centralized management, you also have functional integration and vice versa. I think the problem with the application of that rule to this case is what companies are you looking at? In other words, if you look at simply the parent and the packaging companies and say, if there is centralized management, then there's also functional integration. Okay, maybe that's a defensible point of view. The problem, and again, this is the fatal flaw that the ALJ committed, is he did not apply that rule vis-a-vis the packaging companies and the filtration companies. And I think if that's your perspective, there is no centralized management, and therefore there is no functional integration between those operating companies. And that's why you assert in your alternative that there really are two unitary business groups here, the parent and each of the subsidiaries separately. That's exactly right. That our initial position, our primary position, is that because of the absence of that dependency and contribution at the operating company level, you don't have a unitary business to the extent that there is some type of centralized management or centralized functions that are provided by Clark or the parent. Well, at worst, what you have then are two separate groups with the parent, a member on a pro-rata basis of each group. And that's actually a result that is mandated by recent legislation, which we believe applies retroactively to these years. How about the argument on the subsidiaries where you have filtration companies on one hand and packaging on the other? I mean, are they related? Absolutely not. Absolutely not. I mean, if you look at the record, it's clear there were no intercompany sales. There were no intercompany personnel transfers. No shared space. J.L. Clark, the packaging company, is based in Rockford, one of the filtration companies at a warehouse in Rockford, at a completely different part of the city. So there is no shared space. They have different logos. They have different marketing. They have different customers, different products, different departments. Why do they have different departments? They produce different products. If you're producing different products, you're going to have a separate purchasing department. You're going to have a separate sales department, separate R&D. I mean, it makes sense. You know, when you look at the record in the case and take a high-level approach to the nature of these businesses, why there's no integration? The products are entirely different. If you look at some of the other Illinois unitary cases that both sides have cited in the briefs, you'll see that in the cases where the courts have found a unitary business, you have companies that produced the same thing. The citizens' utilities case, all the companies were in the water business. The boarding case, the companies were all in the bottling business. Hormel were all food subsidiaries. Caterpillar were all heavy industrial machinery manufacturers. That's not a surprise. To have functional integration, it's a lot easier when you have companies that produce the same thing. And I think that goes to your point, Justice Gordon, about the horizontal integration. How about the stock option compensation for the subsidiaries? Wasn't that based totally on what Clerc Court does as a whole? It was maybe as a whole, but it was certainly based in large part on what the individual business units did as well. And to the extent that an individual business unit was more profitable, then there were more stock options available. And the profitability of the business units was really a product of what they did on a day-to-day basis, which is what they managed on their own. Again, the Clerc Court executives were not involved in the day-to-day management of those businesses. Well, you know, in reading this, it seems that the stock option compensation was based solely on Clerc Court as a whole, not on the subsidiaries. I mean, you could say that if the subsidiaries did good, then Clerc Court would do good, but it was based entirely on Clerc Court. Right, but Clerc Court itself is the parent holding company. Right. So it's not really manufacturing anything or selling anything. So the group's profitability is a function of what the individual businesses themselves do and what the individual businesses themselves do depends on what their business unit presidents do, the vice presidents do, and that all occurs at the individual company level. It doesn't occur at headquarters at Clerc Court. I think I've touched upon all the points that I would like. I think the one final point that I would like to make is as far as the standard of review goes, to the extent that there are legal issues here, they are reviewed de novo, and it's our position that there is no deference paid to the agency decision on legal issues. If there are factual issues, they're reviewed under the manifest way to the evidence, and the application of law to fact in this case would be reviewed under the clearly erroneous standard. But for all the reasons that we've expressed in our brief... That really doesn't help us too much. Why don't you tell us what you believe the dispositive issue is and what's the standard of review for that issue? Sure. I think the threshold issue here is what is the proper rule of law. Are we looking at only the relationship between the parent and its subsidiaries, or are we looking at the relationship between the operating companies themselves? That's a legal issue, and that should be reviewed under the de novo standard with no deference paid to the agency's decision. As far as some of the factual issues that we mentioned in our briefs, the extent to which the parent controlled the human resources department at the operating companies, that's a factual question. That's going to be reviewed under the manifest way. And then as far as applying the proper rule of law, whatever that might be... When we get to the standard of review, the two of you agree as to what the standard of review is. Do you not? We divert a little bit in that we believe that the de novo standard is applied without deference to any legal findings that the ALJ made, whereas counsel for the department has argued that while it might be de novo, there should still be some deference paid to the ALJ determination. But for the reasons that we've expressed in our brief and this morning, we respectfully ask this court to reverse the ALJ determination. Thank you. Thank you. May it please the court, I think I'd like to begin with the colloquy between Justice Garcia and opposing counsel regarding what you referred to as the two paths to get to functional integration, because I think that's at the core of this case. And I think there's a bit of confusion as to where plaintiff's legal argument ends and his sort of clear error or factual argument really begins. I think the easiest way for me to do this would be to ask the court to consider a hypothetical circumstance. Imagine a parent that owns a lumber company and a shelf maker. And imagine that there are three different ways they could theoretically structure their company. These are admittedly extreme examples. But one would be to structure the parent as a pure holding company, simply receives reports and files those to the relevant government authorities. Another would be to dictate to its two subsidiaries that they have to buy and sell products to each other at cost. And a third would be that the parent says to each of its subsidiaries, you must sell to us, the parent, your lumber at cost and your shelving units to us at cost. And then we will resell to the other subsidiary the lumber that's necessary to make the shelves or the shelf that's necessary to hold the lumber at cost. Now, I think... I absolutely can do that, Your Honor. It seems here I see that the connection between the two subsidiaries and the hypothetical that you've just given is really the parent holding company. They act as the middle man. I mean, they in fact are at the top, but they're also between the two because they accept products from one and sell it to the other. And I have a question whether that situation exists in the fact before us. Well, I think it's common ground between the parties that in the second variation there where the two companies are forced to engage in direct dealings, that that would be a unitary business group. And I think with respect to the first one, we're on common ground as well that that's not a unitary business group. With respect to the third one, it's plaintiff's argument. It has to be based on what they said that that's not a unitary business group because there are no direct dealings. That is an absolute element of a unitary business group. Well, then why don't we go back to the original question. I think you absolutely hit the nail on the head. Are there two paths? Can we simply focus on the centralized strong management or do we have to find functional integration between the children? If you look at what the statute requires, Your Honor, it says very clearly you have to have integration with each other and then it provides as plaintiff's argument. And with each other, what are you referring to, each other? Each other between all of the different entities within the organization. But that functional integration is sufficient to demonstrate integration and that can occur through strong centralized management. That's the standard in the statute. In the third hypothetical that you just gave us. Yes. Is that your suggestion? That's absolutely strong centralized management that creates integration. But I don't know that it's strong. It certainly is a connection between the two and that's what I'm trying to find. To the extent that there's a rim and spokes to use that simple analogy, where's the rim in this case? All right. Perhaps another hypothetical. No, just tell me where the rim is. What's the connection between the water filtration? Is that? No, this one is the various filtration companies and the packaging companies. All right. Where's the connection between those two? It's the money. The money resides in Clarkport. Well, the money exists. No, it doesn't. Because once a day, the money is lifted out of each of the subsidiary's coffers. It's commingled into a single fund. Isn't that what a holding company does? Absolutely not, Your Honor, because then when expenses need to be met, the money is kicked back down to the subsidiaries. There's a two-way street with regard to the money. Now, what's important here, imagine that one of Clarkport's subsidiaries wanted to build a large new facility, a factory. Where are they going to get the money from? They're not going to get it from their own account. They're going to get it from Clarkport. Well, where did Clarkport get it? Clarkport got it from all of the profits of all the other subsidiaries, and it got that money interest-free. It didn't have to go to a bank in order to get and pay interest on it. Let me ask you this. What's the origin of the Unitary Business Group? Isn't it some sort of approximation or estimation of the business that originates in the state, and therefore you're going to pull in income from another state because you really can't know for sure how much is attributable to the state that you're actually in? Yes. So there has to be that connection. As a matter of first principles, I think that you're absolutely right. That's the root of the business rule is the Commerce Clause and the Due Process Clause. And the question is whether or not you can truly say the income generated in one state was only generated in one state, irrespective of any other activities that took place elsewhere. And I think as a matter of first principles, the direct subsidiary to subsidiary, the direct dealings rule that the plaintiff is trying to smuggle into this statute here, which is not provided for as a matter of plain text. I think that's pretty obvious. That standard is nowhere to be found with respect to those concerns. If you use the examples that I think permeate the law here, what you will see is that it is entirely possible that decisions made in Illinois can affect business that takes place in Tennessee. And so you can't say that the business that took place in Tennessee, the dollars earned there, were not also earned as a result of activities in Illinois. That's the broad constitutional rule. And so using my factory example, I don't think you can say that the factory that's built in Tennessee was not built as a result of activities that took place in Illinois. It's integrated. It's all part of one cohesive whole. And it's not just the centralized cash management system, which I think the plaintiff is largely somewhat trying to gloss over, because it's functionally identical, except for a couple of labels to the system that existed in citizens' utilities that the Illinois Supreme Court said was the most illuminating factor in the case. But I think it goes beyond that. That's part of a comprehensive program. In order to build that factory, they've still got to get permission from their parent, because it's going to be more than $25,000, presumably. And so CoraCore, as a parent, is going to be making this budgeting decision with the entire group as a whole in mind. We can't build a factory for every one of our subsidiaries in one year. Their budgeting decisions and their constant reviewing of adherence to the budget is also done based on the global concerns. Here's the problem I have. You're absolutely right in terms of the connections and the flow of money, and it benefits the subsidiaries, because money coming from one can be used to benefit the other. I didn't think that was part of the commerce, the due process analysis, because what we're looking for is income that's taxable and attributable to the state in which it is seeking to tax. And to that extent, what if they'd gotten a bank loan? What's the difference? Where the money comes from? Well, interest is the first obvious difference. But what's the difference in terms of where the state of Illinois' interest in finding income that is taxable in the state of Illinois from a subsidiary that is outside the state? There has to be some sort of income attributable to business within the state. Well, but that's certainly present here. I mean, it's very clear that these filtration companies that are out of state, for example, are gaining the benefit of a large pool of cash that they can draw on in order to better their own businesses from activities that take place in Illinois. Where do they better their businesses? They better their businesses in the state in which they're located. They don't better their businesses in the state of Illinois. Certainly they do. Absolutely they do because Clark Corp. Here, maybe this is more basic. To the extent that there's income coming from, what is it, Clark? Clark Corp. Sorry. This is a parent, and then J.L. Clark is a parent. J.L. Clark. To the extent that J.L. Clark is successful in Illinois and it's passing on cash to Clark Corp. and Clark Corp. is using that cash to benefit the packaging company, why isn't the income generated by Clark enough for the state of Illinois to tax it? Why does it have to go and try to bring in income from this other subsidiary that's outside our boundaries? Well, from a purely policy perspective, that's a judgment for the General Assembly to make. If the General Assembly wants to tax to the constitutional maximum, as they've made very clear, they're perfectly entitled to make that legislative judgment. And I don't think. Tell me where they do that in the statute. Well, I think that in terms of the constitutional maximum, they say it expressly in Section A1, Section 1501A1, where it says business income, which is all taxable income, is defined to the limit under the Constitution of the United States. So that's clear. I think with respect to the unitary business rule, I think you have to view it through the lens of that provision, which states, we're going to have the broadest possible unitary business group. I understand the policy concern you're expressing, Your Honor, that perhaps we're getting a little bit tenuous. And it doesn't help our state to do that, quite honestly, because it doesn't encourage others to come into our state and begin businesses. If they can be taxed, even though they're not within our state. And I'm sure CLARCORP, with its figurehead and ministerial board of directors, could lobby the General Assembly to get the law changed. I think they may, in fact, decide. In fact, the question I really had, and it's probably outside the record, but the tax returns we're addressing here are 2002 and 2003. Yes. What happened to subsequent years? Did something change so that the issue before us really only addresses those two tax years? Well, those are the two years that the plan sought refunds for, and in terms of how CLARCORP filed after that process. Because Posner, in his envirodyne, talked about restructuring the corporation and changing the way you could be seen and, therefore, avoid this taxation problem. And I wondered whether CLARCORP had done something like that to avoid this problem in the future. Well, not that I'm aware of. CLARCORP's whole argument is predicated on this idea that it's very similar to envirodyne. And respectfully, I agree with at least the premise of Justice Gordon's question, which is that it's, in fact, much more consistent with our position than theirs. All that envirodyne decision says is that the mere concentration of incidental office functions that are sort of inherent is going to be insufficient. All right. Well, I'm pretty familiar with envirodyne. Why don't you tell me, where do you think the language Posner used for the position the State is taking here? Well, I think that the position is that there needs to – I mean, I can hold the opinion. Sure, please. There has to be, in italics, some integration beyond the bare minimum of central office functions shared by virtue of the affiliates having a common parent that has decided to file consolidated tax returns. So where's the integration at here? Between the subsidiaries as opposed to going through the parent? Well, I think if you start from the principle, which is the position the department took in envirodyne, that just the sort of incidental byproduct functions, which in this case would be those that are required just because it's a holding company, the steps that it has to take in terms of probably tax and to a lesser degree accounting, those probably alone by themselves wouldn't be enough. But when you start layering, start adding factor upon factor, layer upon layer of control in the parent company, you then have a unitary business group. And it's because we added on to that these overlapping executives, we added on to that the same pension, retirement benefits, ordinary benefits. We added on to that the regular audits, the budgeting, all of the different factors we outlined in our brief. At some point, all of that in the aggregate has to be sufficient. I think Plano's argument is. That raises the problem again because I would think that there would be some sort of demonstration that connecting the business end of it to the state of Illinois as opposed to the oversight. Well, the question is whether the oversight stimulates the flow of value. I recognize that we have in envirodyne the language that Judge Posner included at the end, which says, I'm not entirely persuaded that just central management alone is sufficient. I don't think we're in the, I think he says in many cases that will absolutely be sufficient. But I'm not sure that's always true. I'm not in the margins here. This is a case that's in the heartland. To the extent that the Plano's argument is that he's getting into that marginal category at the end, I think he's got to show something that these are really purely incidental, accidental byproducts that Clarkborough has no discretion over. If there are no additional questions. Thank you very much. Rebuttal. Just a few points on rebuttal, please. Let me address the envirodyne decision first because I think there is a very key sentence in the decision that I think really brings into focus what we have at issue here today. The Seventh Circuit said that envirodyne is actively involved in the management of both subsidiaries. Both may therefore be said to be under common management and each we may assume is functionally integrated with envirodyne. So what counsel just mentioned about all of the alleged centralized services that Clark Corps provides, whether it's pension, whether it's payroll, the cash management system, whatever that might be was arguably present in envirodyne as well. The court recognizes that there was a parent that provided strong centralized management services. Judge Posner's point was that's not enough. That's the hub. You still need a rim. You need a connection between the operating subsidiaries. Going back to counsel's hypothetical, I think what I would prefer to do is look at the actual facts of this case and maybe use those as a basis for a hypothetical. But what we have here is we have a packaging company that's based in Illinois that is producing packaging products in Illinois. It has some affiliates outside Illinois that are in the filtration business. Those businesses do nothing to depend on or contribute to each other. If you had a situation where the Illinois- But the department is arguing that they do depend on each other in terms of the fact that this cash management system that they both labor under supports each other. Sure. Do you disagree with that? I do. I do. Because as far as the cash management system goes, Your Honor, that's just the means for a parent company or for subsidiaries really to pay dividends to their parent and then for the parent to make capital contributions to its subsidiaries. I mean, cash is- That's not kind of the way that the department portrayed it in their argument. They portrayed it, and I invite you to disagree, they portrayed it as the money being swept up every day, commingled, and then a determination being made as to how the money should go back to pay for expenses, I assume. Sure. But, again, when money is swept up, it's really nothing more than a dividend that is being paid by a subsidiary. And how that money is ultimately spent, the expenses that are incurred, again, are for the most part left up to the individual business units. You have the $25,000 capital expenditure limit. But other than that, the non-capital expenditures, the raw materials, the consulting fees, the rent, the utilities, that's all left up to the business units. So how they incur their expenses is left up to them. And it's not as if when money is swept up, the subsidiaries are left with nothing. I think that's exactly right. No, that's exactly right. They can't. Right. Right. So if you have this Illinois business, if it were, for example, selling product or providing raw materials or providing know-how, technology, R&D, intercompany personnel transfers, if you had that between the Illinois-based packaging company and the out-of-state filtration businesses, I can see the integration there. I could see that. That's not what we have here because we have two separate businesses with different raw materials, with different customers, different marketing, no integration at the operating company level. Justice Garcia, I think you asked about future years. And, you know, what's interesting in this case. You don't want to go outside the record. No, I won't. I won't. Remember, this is rebuttal five minutes. Sure. Sure. This is my final point. But I think it's important to note that the packaging companies are continuing to file in Illinois. I mean, this is not a situation where a company is trying to avoid its filing responsibility. They will file. It's just a question of how they file. And so I think that, in some respects, addresses the future years question. But, again, for the reasons we've expressed, we would request that the court reverse the ALJ determination. Thank you. Thank you. I want to thank both sides here. You provided interesting briefs, interesting arguments, and an interesting case. And we will take it under advisement. And the court is now adjourned.